UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

STEPHEN E. ROBERTSON,            )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )    Case No. 2:14CV67 CDP
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social Security )
                                 )
        Defendant.               )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Stephen Robertson's application for

Supplemental Security Income under Title XVI of the Social Security Act (the

Act), 42 U.S.C. §§ 1381, *et seq.* Claimant Robertson alleged he is disabled due to

broken hip, osteoarthritis, depression, anxiety, and sciatica nerve damage. The

Administrative Law Judge (ALJ) concluded that Robertson was not disabled.

Robertson challenges that determination on two grounds. First, Robertson argues

that the ALJ failed to give controlling weight to the opinion of his treating

physician. Second, Robertson alleges the ALJ made a deficient credibility

analysis. Because I find that the ALJ's opinion is supported by substantial

evidence, I will affirm the Commissioner's decision to deny benefits.

## Procedural History

On December 20, 2010, Robertson applied for Supplemental Security Income (SSI) under Title XVI of the Act, alleging an onset date of November 10, 2010. Tr. 143–49. The Social Security Administration denied the claim, and Robertson sought a hearing before the Administrative Law Judge ("ALJ"), which was held on October 17, 2012.[1] The ALJ issued an unfavorable decision on January 28, 2013, and the Appeals Council denied his request for review on May 13, 2014. The ALJ's decision now stands as the final decision of the Commissioner.

## Evidence Before the ALJ[2]

### Robertson's Testimony

Robertson appeared in person before the ALJ at a hearing held on October 17, 2012. At the time of the hearing, Robertson was 47 and had his G.E.D.

Robertson testified that he stopped working in 2009 after he fell and broke his hip, which now has a metal rod in it. Pain in his hip comes and goes, but it is most aggravated by walking. Robertson can walk three blocks before the hip starts bothering him and ten blocks before he needs to sit. Tr. 41–42. He can stand still

---

[1] Missouri participates in a program that eliminates the reconsideration step in the administrative appeals process. *See* 20 C.F.R §§ 416.1406, 416.1466. Robertson's appeal proceeded directly from initial denial to the ALJ level.

[2] Although I have reviewed the entirety of the record, I recite only those portions that are most relevant to the issues raised by Robertson.

for up to five minutes.  Tr. 45.  At most, Robertson can walk ten blocks up to three times per week, but he can never bend to pick something up off the floor.  Tr. 42. Robertson walks each day for five to eight blocks and will sometimes do this twice in a day.  Tr. 47.  Robertson can sit for up to one hour and fifteen minutes before pain travels from his hips down to his legs.  Tr. 42–43.  He has difficulty breathing due to COPD but takes albuterol.  Tr. 53.

Neck pain causes Robertson difficulty in walking, turning, and looking up and down, but he is able to hold his neck down to look at the table in front of him. Tr. 46.  Opening the mail causes him no problems.  Tr. 47.  Robertson uses a cane as a safety precaution when he leaves his house, because his Lidoderm patches make him dizzy;[3] however, he does not need the cane when at home.

Robertson's average day involves brushing his teeth, eating breakfast, sitting on the couch, and playing on the computer for a half-hour at a time.  Tr. 47. During the day, he spends most of the time sitting on the couch.  He will sit for 15 to 20 minutes and then readjust his weight from the right side to left.  Robertson will get up and walk for 20 minutes and twice a day he lies down for 40 minutes. Tr. 50.

---

[3] Lidoderm is the brand name for lidocaine patches, which provide localized pain relief. National Institute of Health, Medline Plus (hereinafter, "Medline Plus"), https://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html (last revised June 13, 2013).

Robertson estimated his ability to lift at ten pounds between eight and ten times per day.  Tr. 51.  He says that his depression from not being able to work makes him more mopey and bored on his "bad days."  Tr. 54.

In May 2011, Robertson spent 20 hours per week pulling weeds and sweeping as part of a mandatory community service project.  Tr. 56.  Before his hours per week increased to 30, his doctor wrote him a note excusing him from further service.  *Id.*

*Vocational Expert Testimony*

The ALJ presented the vocational expert (VE) with a hypothetical person of Robertson's age, education and work experience and capable of performing the full range of sedentary work as defined in the regulations.  The person could sit or stand alternatively at will, provided the individual not go off task more than ten percent of the work period.  The person would be able to climb ramps and stairs frequently, could occasionally balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes, or scaffolds.  The person must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; he would be limited to simple, routine, and repetitive tasks.  Tr. 61.

The VE testified that such a person could perform a number of jobs available in the local and national economies, including cashier II, hand packer, and products assembly.  Robertson's attorney reduced the ability of the hypothetical individual

to eliminate balancing and stooping, and the VE testified that the same jobs would remain available.  Tr. 64.

*Medical Records*

Robertson underwent hip surgery by Dr. Adam Derhake in December 2009, after which he reported he was using crutches and doing quite well.  Tr. 258.  In March 2010, Dr. Derhake noted that Robertson had been discharged from physical therapy for noncompliance.  Tr. 252.  In April 2010, Robertson's gait was nearly normal, and he was returned to work without restrictions.  Tr. 250.

On November 30, 2010, Robertson reported to Dr. Michael Dykstra for pain in his hip.  Dr. Dykstra prescribed ibuprofen 800 mg and hydrocodone compound 5/500 mg with directions to take one to two pills of the latter every six hours as needed.  Tr. 248.  On December 6, 2010, Robertson reported to Dr. Philip Wilson for pain in his right hip.  He complained of difficulty walking and standing for any length of time.  Dr. Wilson requested a CT scan and prescribed Celebrex 200 mg.[4] The CT scan revealed his hip pinning in satisfactory position.  Dr. Wilson diagnosed him with right hip pain and recommended against opioid medications. Tr. 245.

---

[4] Celebrex is a nonsteroidal anti-inflammatory drug (NSAID) that is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html (last revised Aug. 15, 2012).

On December 27, 2010, Robertson returned to Dr. Derhake, who diagnosed Robertson with right lumbosacral spinal degenerative disk disease and no radiographic or clinical evidence of continued hip pathology. Dr. Derhake recommended an MRI of the spine, Tr. 241, which revealed severe degenerative loss of disk height at L5-S1 and moderately severe bilateral degenerative neuroforaminal stenosis. Tr. 261. An X-Ray of Robertson's hip indicated complete healing. Tr. 263.

From September through December 2010, Robertson reported to the emergency room several times for a broken toe, dizziness/nausea, leg pain, and hip pain. He was diagnosed with a broken toe, mild osteoarthritis, and degenerative changes in his lumbar spine without fracture, dislocation, or malalignment. Tr. 229–240.

Dr. Dykstra wrote on January 11, 2011, that Robertson ambulates well without difficulty and prescribed Celexa.[5] Tr. 271–72. In March 2011, Robertson had anterior cervical fusion after it was noted that he had dissection, loss of disk height, and a large disk protrusion. Tr. 483, 591. On March 25, 2011, Robertson was told not to work by Dr. Reuben Morris after receiving cervical fusion. Tr. 284. On May 2, 2011, Dr. Morris wrote that Robertson's gait was normal and

---

[5] Celexa is an antidepressant. Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last revised Nov. 15, 2014).

he uses a cane for balance.  Tr. 309.  Two weeks later, Robertson reported that he is having increased back and neck pain after following advice to remove the hard cervical collar.  Robertson's medications included Buspirone,[6] Celexa, hydrocodone-acetaminophen, and ibuprofen.  Tr. 307.  On May 19, 2011, Robertson returned off-schedule complaining of lumbar pain.  He was diagnosed with low back pain and cervical and lumbosacral spondylosis and was told to return in five to six weeks.  Tr. 306.  Imaging taken in June 2011 revealed uncomplicated cervical spine fusion.  Tr. 495.

Robertson sought treatment from Dr. Lance Real on June 2, 2011.  Dr. Real recommended referral to pain management and possibly psychiatry.  Dr. Real prescribed a higher dose of hydrocodone and increased dosage of Buspirone and Celexa.  Tr. 303.  Robertson reappeared on June 8, complaining of chest, neck, thoracic, and lower back pain.  He was resistant to Dr. Real's recommendation for cardiac workup.  Tr. 299.

Dr. Morris recommended on June 13, 2011, that Robertson try physical therapy; Robertson deferred on steroid injections.  Robertson reported decreased pain in his back, had some thoracic tenderness, and no lumbar tenderness.  Tr. 294.  Dr. Real also treated Robertson on June 13 for complaints of back and chest pain.

---

[6] Buspirone is used to treat anxiety disorders or to provide short-term treatment of anxiety symptoms.  Medline Plus, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (last revised Apr. 15, 2011).

Dr. Real reported good muscle strength in both upper and lower extremities, with the right extremities weaker at 4/5 strength. Robertson exhibited no difficulty walking, though he showed signs of pain with turning his head and rotating the hip. He had reasonable range of motion in both hips. Tr. 614.

In July 2011, Roberson reported to Dr. Real with continued complaints of neck and back. He requested an increase in current dose of hydrocodone, but Dr. Real refused to prescribe the increase and instead advised lidocaine patches. Robertson also asked for a release from his two-to-three hours per day community service, but Dr. Real deferred to Dr. Morris. Tr. 290. Dr. Morris recommended epidural steroidal injections. Tr. 287. Dr. Real diagnosed mild COPD, prescribed albuterol, and recommended that he stopped back abuse. Radiographic review performed by Dr. Reynolds indicated minimal disk bulge in the cervical vertebrae, high-grade stenosis, and mild degenerative changes. Tr. 340. Imaging of the thoracic spine revealed no focal disk herniations, no subluxation, no central spinal stenosis, no cord compression, mild posterior marginal osteophyte formations, and small bilateral pleural effusions. Tr. 493.

On August 4, 2011, Robertson returned to Dr. Real with back pain. He reported that the steroidal injections proved 80% improvement but that he suffered a sudden increase in pain after moving an air conditioner last week. Dr. Real refused to increase hydrocodone but did provide a letter regarding work restrictions

for community service. Tr. 328. On August 23, 2011, Heidi Ludwig, a certified nurse practitioner, increased his hydrocodone to six tablets per day and ordered a CT of his ankle. Tr. 321.

Dr. Morris saw Robertson on September 15, 2011. Robertson reported improved pain in his back, with some intermittent radiation of leg pain and back stiffness. An examination of the foot did not show that it was grossly swollen. Dr. Morris advised a home exercise program. Tr. 363.

CNP Ludwig saw Robertson again on September 20, 2011. Robertson's foot had some swelling with bruised appearance. He ambulated independently. Tr. 360. Imaging revealed a bunion and increased uptake in the right ankle. Tr. 353. Robertson's medications were refilled through November 2011.

On September 21, 2011, Robertson was admitted to Blessing Hospital after a fall. Imaging revealed soft tissue swelling of the ankle, degenerative and mild posterior wedging in the lumbar spine, diffuse spondylosis of the cervical spine, and some bony central canal stenosis. Tr. 570–74.

Robertson sought follow-up treatment from December 2011 through February 2012. Examinations of his neck revealed minimal localized cervical tenderness and no muscle spasms, despite complaints of both. Tr. 388. He also complained of back pain and intermittent radiation of pain into his right leg, for which he received a trigger point injection. Tr. 381. An examination on January

26, 2012 revealed no paraspinal muscle tightness in cervical region or trapezius muscle spasm. Robertson complained of "some neck pain" and "some hip discomfort" made worse by walking. Tr. 370.

On March 28, 2012, Robertson called Dr. Morris's office complaining of lower back pain and leg weakness after he hit his back on a truck. Tr. 392. He went to the Blessing Hospital emergency department, where imaging of his lumbar spine showed significant degenerative narrowing at L5-S1. Tr. 577. The next day, an examination resulted in tenderness on lumbar spine palpation with no paraspinal muscle spasm. Robertson's lower extremity strength was normal and straight leg raising resulted in back pain bilaterally. Dr. Morris advised to continue current medications. Tr. 443. On April 3, Robertson reported to CNP Ludwig. He mentioned that he walked to the office and complained of back pain that is "no longer shooting stabbing pain." Robertson's Gabapentin dose was adjusted and he was administered a steroid shot. Tr. 436. Two days later, Robertson returned to Dr. Morris and noted his pain was slightly improved; walking does not make pain much worse. Examination revealed moderate lumbar tenderness and all muscle groups in both legs are normal. Robertson was advised to continue stretching exercises and to walk twice daily for 20 minutes. Tr. 430. On April 11, 2012, Robertson called in and reported that he "is a little stiff but a lot better." Tr. 427. A follow up examination on April 30, 2012, revealed minimal if any lumbar

tenderness.  Robertson had 4+ right hip flexion strength and normal strength in other muscle groups.  He was advised to continue flexibility exercises and return in three months.  Tr. 420.

On May 3, 2012, Robertson called Dr. Morris's office and described pain and weakness in right leg after walking.  He stated that his back pain comes and goes at times; he was advised to walk thirty minutes daily.  Tr. 467.  Robertson appeared in person for treatment to CNP Ludwig on May 14, 2012, complaining of pain in his right foot, ankle, hips, knees, neck, and lumbar region.  He appeared in no obvious pain.  CNP Ludwig administered a pain shot and referred him to the pain clinic.  Tr. 462.  Robertson again sought treatment from CNP Ludwig on May 23, 2012, again complaining of right foot/ankle and bilateral knee pain.  CNP Ludwig administered a pain shot and established a plan to "obtain X-ray of left knee as he reports this knee gives him the most trouble."  Tr. 455.  Imaging of the left knee was "unremarkable"; four views revealed no indication of fracture, dislocation, advanced degenerative change, or specific compartment narrowing. Tr. 491, 581.  An X-Ray of Roberson's knee taken on July 30, 2012, revealed no acute fractures, no dislocation, no radiopaque foreign bodies, and no acute bony abnormalities.  Tr. 490.

On July 30, 2012, Robertson went to Dr. Morris's office for a follow up.  He complained of lumbar pain with morning stiffness and stated that an epidural

injection provided modest relief.  Notes state that he walked into the office with a limp but walked to the examining room with a smooth gait and no limp.  He has minimal lumbar paraspinal tenderness.  Dr. Morris recommended continuing current treatment program with exercises and ambulation.  Tr. 519.  On August 17, 2012, CNP Ludwig noted that he again complained of hip and shoulder pain but exhibited no outward signs of pain.  Tr. 513.

Imaging of Robertson's right foot taken on July 20, 2012, revealed no fractures, no dislocation, unremarkable soft tissues, and no bony abnormalities.  Tr. 568.  Dr. Morris saw Robertson in December and noted that "his symptoms are slightly improved."  His back pain is better due to Lidoderm patches and exercise program.  Tr. 658.

Robertson saw Dr. Morris several times in 2013.  In January, Robertson complained of paresthesias and numbness in both legs, which "began after he was moving some plastic containers of Christmas decorations."  Tr. 654.  Robertson also reported a constant throbbing lumbar pain, which increases only by walking.  Upper and lower extremity was normal except for right hip flexors, which were 4+/5+.  Tr. 654.  In February, he was diagnosed with back pain, lumbago, and an enlarged spleen.  Dr. Morris recommended against surgery.  Tr. 650.

*Dr. Morris's Ability-to-Work Assessments*

Dr. Morris wrote a letter on May 16, 2011 to advise that Robertson had undergone major cervical spinal surgery on March 22, 2011. Dr. Morris advised that Robertson was recuperating and unable to work, and that he could not estimate a return date. Tr. 564. On August 13, 2011, Dr. Morris wrote a letter to the Lewis County Circuit Court on behalf of Robertson. Dr. Morris reported that Robertson is able to perform "sedentary work," which he described as allowing Robertson to switch from standing to sitting as needed. Robertson should be limited to lifting ten pounds and pushing/pulling fifteen pounds. He cannot perform tasks that require repeated bending of the neck or back or any work that requires lifting above shoulder height. Tr. 563.

Dr. Morris authored a medical source statement on October 15, 2012, in which he described Robertson's ability to do physical work-related activities. Dr. Morris stated that sitting is unaffected by the impairment, and that Robertson should be limited to standing less than two hours in an eight-hour workday. Robertson can lift up to ten pounds occasionally and frequently lift less than ten pounds. Robertson's ability to push is limited; such movements "will cause increased neck pain such that he won't be able to tolerate neck movement." Dr. Morris also advised of postural limitations: Robertson can occasionally climb, kneel, and crouch; can frequently crawl; and can never stoop. Roberson's ability

to reach overhead is limited to "occasionally" because of neck and shoulder pain.
Robertson can frequently perform gross manipulations and constantly perform fine
manipulations and "feeling." His seeing, hearing, and speaking are not limited.
Dr. Morris opined that Robertson had no environmental limitations. Tr. 632–35.

## Legal Standards

To be eligible for SSI under the Act, the claimant must prove that he is
disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v.
Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act
defines disability as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected to last for a
continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An
individual will be declared disabled "only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do his previous work
but cannot, considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national economy."
42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a
five-step evaluation process. *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S.
137, 140–42 (1987). The Commissioner begins by deciding whether the claimant

is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner reviews whether the claimant has the Residual Functional Capacity (RFC) to perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled. If the claimant cannot perform his past relevant work, the burden of proof shifts and the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. *See Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998); 20 C.F.R. § 416.920.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v.*

*Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test,"

however, is "more than a mere search of the record for evidence supporting the

Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007)

(internal quotation marks and citation omitted). "Substantial evidence on the

record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation

marks and citations omitted).

To determine whether the Commissioner's decision is supported by

substantial evidence on the record as a whole, the court must review the entire

administrative record and consider:

> 1. The credibility findings made by the ALJ.
> 2. The plaintiff's vocational factors.
> 3. The medical evidence from treating and consulting physicians.
> 4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
> 5. Any corroboration by third parties of the plaintiff's impairments.
> 6. The testimony of vocational experts when required, which is based upon a proper hypothetical question that sets forth the claimant's impairment.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992)

(citing *Cruse v. Bowen*, 867 F.2d 1183, 1184–85 (8th Cir. 1989)).

The court must also consider any evidence that fairly detracts from the

Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d

1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions

may be drawn from the evidence, the Commissioner's findings may still be

supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at

1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is

substantial evidence on the record as a whole, we must affirm the administrative

decision, even if the record could also have supported an opposite decision."

*Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks

and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977

(8th Cir. 2003).

## The ALJ's Findings

The ALJ found that Robertson was not disabled within the meaning of the

Act from December 20, 2010, the date the application was filed, through the date

of the decision.

1.  The claimant has not engaged in substantial gainful activity since
December 20, 2010, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments:  status post
right hip fracture; degenerative disc disease of the cervical spine status
post cervical fusion; lumbar spondylosis; and depression (20 CFR
416.920(c)).

3.  The claimant does not have an impairment or combination of
impairments that meets or medically equals the severity of one of the
listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20
CFR 416.920(d), 416.925 and 416.926).

4.   After careful consideration of the entire record, I find that the
claimant has the residual functional capacity to perform sedentary
work as defined in 20 CFR 416.967(a) except frequent climbing of
ramps and stairs; no climbing of ladders, ropes, and scaffolds;
occasional balancing, stooping, kneeling, crouching, and crawling;

avoid moderate exposure to excessive vibration; avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; and limited to simple, routine, repetitive tasks.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   The claimant was born on July 28, 1965 and was 45 years old, which is defined as a younger individual age 45–49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since December 20, 2010, the date the application was filed (20 CFR 416.920(g)).

## Discussion

Robertson alleges two points of error.  First, he alleges the ALJ failed to give the opinion of Dr. Morris controlling weight.  Second, Robertson alleges that the ALJ's finding that he lacks credibility is legally deficient and is not supported by substantial evidence.  Both of these allegations impliedly go to the ALJ's RFC determination.

*The ALJ's Decision to Afford "Little Weight" to Dr. Morris*

Robertson argues that Dr. Morris's medical source statement shows limitations that prevent him from working even a sedentary job. The ALJ afforded "little weight" and "little probative value" to Dr. Morris. In reaching that decision, the ALJ noted that two of Dr. Morris's opinions were made concurrent with surgeries. The ALJ also noted inconsistencies between Dr. Morris's opinion and the medical records.

Under the Social Security Administration regulations, the opinions of treating physicians are generally entitled to substantial weight. 20 C.F.R. § 416.927(d). However, despite this deference, the opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). In fact, an ALJ may discount or disregard the opinion of a treating physician where other medical assessments are more thoroughly supported or where a treating physician renders inconsistent opinions. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).

First and foremost, Robertson mischaracterizes Dr. Morris's opinion, as it does not impose any limitations on Robertson's ability to sit. Tr. 634. Dr. Morris's August 13, 2011 opinion, which was issued while Robertson was still recuperating from neck surgery, likewise stated that Robertson could perform sedentary work. *See* Tr. 563. Imaging studies of Robertson's hip, knee, and ankle

have been unremarkable, and his doctors have repeatedly reported that his muscle strength in his extremities is near full. Robertson has exhibited minimal tenderness and his treatment recommendations have been limited to pain management and exercise. He reported that his back pain was under control with medication. The ALJ's decision to accord little weight to Dr. Morris's opinion regarding Robertson's physical limitations is supported by substantial evidence on the record.

*Robertson's Credibility*

Robertson next alleges that the ALJ erred in his determination that Robertson is not credible. When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).

In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include: "(1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions." *Masterson v. Barnhart*, 363 F.3d 731, 738

(8th Cir. 2004) (citing *Polaski*, 739 F.2d at 1322).  The ALJ need not discuss each *Polaski* factor as long as the he considers the analytical framework.  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).  When an ALJ explicitly finds that the claimant's testimony is not credible and gives good reasons for the findings, the court will usually defer to the ALJ's finding.  *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007).

The ALJ examined Robertson's alleged daily activities and noted inconsistencies in the record.  For example, although Robertson claimed to be disabled from November 2010, he was able pull weeds for two to three hours per day for community service in May 2011.  In addition, although Robertson testifies that he is in pain after standing for five minutes or walking for more than three blocks, he also testified that he walks for five to eight blocks at least once and sometimes twice per day.  These activities show a level of ability inconsistent with the alleged pain.  *See Beasley v. Califano*, 608 F.2d 1162, 1166 (8th Cir. 1979) ("[W]ork performed in spite of limitations or with considerable difficulty may still demonstrate ability to engage in substantial gainful activity.").

The ALJ also noted that Robertson's medical records undermined his credibility.  For example, Robertson repeatedly complained of pain but exhibited no outward signs of pain.  Tr. 513.  Likewise, Dr. Morris noted that Robertson's limp, which was present as he walked into the office, disappeared when Robertson

walked to the examination room.  Tr. 519.  Dr. Morris also estimated that Robertson could perform sedentary work in August 13, 2011.  This opinion was issued while Robertson was recovering from neck surgery, and so it undercuts Robertson's claim that he has been wholly unable to work since November 2010. As noted above, although he has had surgeries in the past, Robertson has most recently been treated with pain medications and exercise and his doctors advised against further surgery.  Such conservative treatments may be relied upon to discount allegations of disabling pain.  *Gowell v. Apfel*, 242 F.3d 793, 795 (8th Cir. 2001).  Robertson's records only show mild instances of osteoarthritis, and so this also undermines any claims as to the severity of that impairment.

The ALJ also examined the effectiveness and side effects of Robertson's medications.  Although Robertson testified that his lidocaine patch causes sufficient dizziness that he needs a cane, Robertson also testified that he does not use a cane at home.  Robertson was also reported to walk without difficulty on several occasions.  Pain medication was reported to reduce his symptoms by 80% in August 2011, and in March 2012, Robertson said that his back pain was no longer "shooting" and that walking caused minimal pain.  Although the record shows that the depression and anxiety medications were initially insufficient, there is little in the record following their increase in June 2011.  Robertson did not complain of any other serious side effects.  This evidence supports an inference

that Robertson's pain, depression, and anxiety were controlled by medication, and so the medical evidence supports the ALJ's credibility determination.

The ALJ's analysis shows that he considered and applied the *Polaski* framework. The record likewise contains substantial evidence supporting the credibility analysis.

*Residual Functional Capacity*

The court finds that the ALJ's assessment of Plaintiff's RFC is based upon and is consistent with all of the relevant evidence. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

The ALJ determined that Robertson could do sedentary work. Such work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like ledgers and small tools. A sedentary job involves sitting, but a certain amount of walking and standing is often necessary to accomplish job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 416.967.

In particular, the ALJ's determination that Robertson could perform sedentary work is consistent with parts of the opinion of Dr. Morris, who opined

that Robertson should experience no difficulty sitting and can lift up to ten pounds. The ALJ also proposed in his hypothetical the ability to change from sitting or standing at will. This limitation likewise fits with Dr. Morris's opinion and Robertson's testimony that he can sit for over an hour at a time before he needs to shift positions. The ALJ's RFC determination is supported by substantial evidence of record.[7]

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.

A separate judgment in accordance with this Memorandum and Order is entered this date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2015.

---

[7] Although Robertson does not raise the issue, the ALJ's determination that a person with his RFC could perform jobs that exist in significant numbers in the national economy is likewise supported by substantial evidence in the form of the VE's testimony. Testimony from a vocational expert based on a properly phrased hypothetical constitutes substantial evidence. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).